**E-FILED**
Friday, 21 December, 2012  01:46:32 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## ROCK ISLAND DIVISION

|  |  |
|---|---|
| DEERE & COMPANY, ) | Case No. 4:12-cv-04105-SLD-JAG |
| Plaintiff, ) | |
| vs. ) | **FIRST AMENDED** |
| SABA SOFTWARE, INC., ) | **COMPLAINT AND DEMAND** |
| Defendant. ) | **FOR JURY TRIAL** |

Plaintiff Deere & Company ("Deere"), through its undersigned counsel, states as follows for its Complaint against defendant Saba Software, Inc. ("Saba"):

### PARTIES

1.  Deere is an Illinois corporation with its principal place of business in Moline, Illinois.

2.  Saba is a California corporation with its principal place of business in California.

### JURISDICTION AND VENUE

3.  This Court has jurisdiction over this action pursuant to 28 U.S.C. Section 1332 on the basis of diversity of citizenship between the parties.

4.  The amount in controversy, exclusive of interest and costs, exceeds $75,000.

5.  Venue lies in the District pursuant to 28 U.S.C. Sections 1391 and 1404 in that Plaintiff has its principal place of business within this District; the parties agreed in writing that Illinois is the appropriate venue for any litigation between the parties; and certain acts giving rise to the Complaint occurred within this District.

NATURE OF ACTION

6.     This action involves a failed implementation by Saba of a Learning Management System ("LMS") for Deere.  The initial agreed to Go-Live Date was November 1, 2011, which was extended to February 20, 2012, and the implementation was not completed by February 20, 2012.

7.     With respect to the averment of common law fraud that is asserted in this First Amended Complaint, as is fully shown below, the fraud was comprised of (a) false statements of material fact; (b) Saba knew that the statements were false; (c) Saba made such statements with the intent that the statements would induce Deere to act; (d) Deere relied on the false statements; and (e) Deere was damaged as a result of its reliance on the false statements.  The fraud was willful, wanton, reckless, deliberate and demonstrated a reckless indifference to Deere.

8.     From an LMS standpoint, Deere has had two distinct LMS systems that it uses. One LMS system was for Deere and its employees (the "Internal" LMS System") and the other was for its dealer/distributors (the "External LMS System", together with the Internal LMS System, the "Internal and External LMS Systems").  Deere has approximately 67,000 employees and over 11,000 dealers worldwide.  Deere used the Internal and External LMS Systems to administer its learning/training programs to hundreds of thousands of company employees, channel partner employees (dealers, distributors, suppliers, etc.) and customers.  The Internal and External LMS Systems were combinations of Deere developing "home-grown" systems, as well as using third-party software.  It should be noted that the very same Deere employees that had been instrumental in the development, implementation and running of the Deere Internal and External LMS Systems were the very same individuals who were involved with the Saba project.

9.      In December 2010, Deere commenced a RFP process and proposals were sought from seven vendors, including Saba, for an LMS that would cover Deere's Internal and External LMS Systems needs.  On September 3, 2010, Saba submitted to Deere an 87-page written RFP response.   The RFP response contained materially false statements that all satisfy the five subparts set forth in paragraph 7 above.   Importantly, Saba's RFP response provided the statements quoted below.  The underlined sections reflect important points to consider since Saba failed not only to meet the initial November 1, 2011 Go-Live date but also the extended February 20, 2012 Go-Live date:

A.  With nearly two centuries of experience, Deere & Company (Deere) is one of the most respected named in the industry and has worldwide brand-name recognition.   <u>The proposed Learning Management System (LMS) will replace multiple systems currently used to manage trainings for employees, partners, and customers with a single, centralized system that supports all global regions.</u>

B.  Saba can offer Deere an LMS that meets the corporate objectives and overall requirements for the system:

▪  Phased Deployment – <u>Saba's Professional Services team will work with the Deere team to ensure an on-time, on-budget "Go-Live" on 1 November 2011 for Phase 1</u>.  [This material statement was false and satisfies all five subparts set forth in paragraph 7 above.  Saba knew at the time this materially false statement was made that Saba could never ensure an on-time, on-budget Go-Live on November 1, 2011.   Saba knew at the time it made this material statement that it was false; that the false statement would induce Deere to act; and that Deere would rely upon such false statement.  Deere was also damaged by its reliance on such false statement.]  Fully 40% of our projects are multi-national in scope, involving multiple languages and currencies, and consolidation from various existing systems to a single Saba Platform.   Our methodology has been proven at hundreds of implementations over the past 12 years, and we can provide strong international references for the Deere team.

\*  \*  \*

- Application must be able to support multiple languages and translations – Saba supports 28 languages out-of-the-box: Chinese (Simplified), Chinese (Traditional), Czech, Danish, Dutch, English (US), English (UK), Estonian, French (Continental), French (Canadian), German, Greek, Hungarian, Indonesian (Bahasan), Italian, Japanese, Korean, Latvian, Lithuanian, Norwegian, Polish, Portuguese (Brazil), Russian, Spanish (Continental), Spanish (Mexican), Swedish, Thai, and Turkish.   In addition, since many global organizations have custom language requirements, Saba offers an optional Language Development Kit (LDK).  Deere could use the LDK to build support for Hindi.

  \* \* \*

- Ability to handle internal and external users (students, administrators, and instructors) – <u>Saba has implemented dozens of systems that support both internal and external users, such as LMSs that provide "for profit" training to partners, distributors, and customers</u>.  Examples include 3M (61,000 internal users and more than 200,000 external users); EMC (generates $70 million a year selling training – (Top 100 Learning Company's published by CLO Magazine (Currently #2); and Hitachi Data Systems.

  \* \* \*

- The Saba Learning Suite – <u>Saba Learning continues to be the most configurable on the market, minimizing the need for expensive customizations</u>.  [This material statement was false and satisfies all five subparts set forth in paragraph 7 above.  Saba knew at the time this materially false statement was made that Saba knew extensive customizations would be needed that far exceeded the fixed price and would cause the necessary November 1, 2011 Go-Live date to never be met.  Saba knew that at the time it made this material statement it was false; that the false statement would induce Deere to act; and that Deere would rely upon such false statement.  Deere was also damaged by its reliance on such false statement.]  The latest release includes enhancements specifically requested by global organizations such as IBM, Schlumberger, Crédit Suisse, YUM! Brands, Hewlett-Packard and others.

  \* \* \*

▪ Flexible Deployment Options – Saba offers flexible delivery models: installed on-premise and OnDemand (Software-as-a-Service).  We understand from the bidders' conference that Deere is open to either deployment model. Saba has provided the pricing information on both options. As SaaS model, Saba OnDemand, offers a 99.5% uptime.

* * *

▪ Most importantly the RFP contained 70 pages that represented the software features/requirements that Deere was requesting and the designation "OOB" was used to represent such fact.  OOB stood for out-of-the-box.  A careful review of pages 18 through 87 of the RFP response reveals that Saba represented that its software had the vast majority of features and requirements that Deere required. [The material statements contained on pages 18 through 87 of the RFP response were false and all five subparagraphs set forth in paragraph 7 above were satisfied.  Saba knew at the time it made these materially false statements that all of the features/requirements that it said were OOB were not in fact OOB and that the software did not have these features/requirements.  Saba knew at the time it made these material statements that they were false; that the false statements would induce Deere to act; and that Deere would rely upon such false statements.  Deere was also damaged by its reliance on such false statements.]  And, as will be discussed below, for those features/requirements not included, Saba agreed in the Agreement that was signed to provide some as Enhancements.

10.     After the RFP response was received, Deere and Saba entered into negotiations and ultimately, on February 23, 2011, a Software Subscription Services Agreement (with corresponding Product Schedule) ("Subscription Agreement") was executed, as well as a Statement of Work ("SOW").  The SOW was executed by Saba's VP of Consulting, Pat Farrell. The Subscription Agreement was executed by "an authorized representative" of Saba. Throughout the negotiations between September 3, 2011 and the SOW and Subscription Agreement execution on February 23, 2011, and most importantly in the Subscription Agreement and SOW, Saba made numerous false representations that it knew were false at the time they

were made.  Saba also knew that such false statements would induce Deere to execute the February 23, 2011 Subscription Agreement and SOW and that Deere would rely on the false statements.  Deere did in fact rely on the false statements in the February 23, 2011 SOW and Subscription Agreement and was damaged by its reliance.  The false statements will be discussed in greater detail below.

11.     The Subscription Agreement provides in pertinent part:

- The Subscription Fee was $5,313,750 and there was a one-time set-up fee of $50,000.  The $5,363,750 was to be paid in installments with $1,031,000 paid on the Order Date and $981,000 on the four subsequent anniversaries of the Order Date, and $404,750 on the fifth anniversary of the Order Date.

- Paragraph 7.2.3 of the Subscription Agreement provides the Software Subscription Services will be "free from programming errors and defects in workmanship and materials that result in a failure to substantially perform as described in its Documentation."

- Paragraph 7.2.4 of the Subscription Agreement provides that the Software Subscription Services shall be "fully compatible with each other and with any other software, systems, or equipment with which it interfaces, interacts, inter-operates, or exchanges data and shall operate as an integrated system to the extent specified in the applicable Documentation."

- Paragraph 7.2.5 of the Subscription Agreement provides that the Software Subscription Services "when configured according to any specifications established by the parties will be available in accordance with agreed SLA's set forth in the Subscription Agreement."

- Paragraph 9.1 of the Subscription Agreement provides if a dispute arose that the parties would internally attempt to resolve their differences. The parties engaged in two of these alternative dispute resolution procedures.

- Paragraph 9.2 of the Subscription Agreement provides if the paragraph 9.1 internal dispute process was not successful, then the parties would mediate. The parties' mediation in Chicago, Illinois on November 5 and 6 was not successful.

- Paragraph 9.3 of the Subscription Agreement provides if the mediation is not successful, then either party has the right to institute a lawsuit.

The statements/representations contained in paragraphs 7.2.3; 7.2.4; and 7.2.5 were material and were false. Saba knew at the time it made these material statements that they were false. Saba also knew that the statements were made to induce Deere to execute the Subscription Agreement. Saba further knew that Deere would rely upon these material false statements. Deere did rely on these materially false statements and was damaged by its reliance.

12.     The SOW provides in pertinent part:

- The SOW in Section 6.1 set a fixed fee of $791,175 for the Implementation of the LMS.

- Section 5 of the SOW fixed a Go-Live date on or prior to November 1, 2011. (This is the same date that Saba represented in the RFP response that the implementation would be complete.)

- Appendix 2 of the SOW represented the 295 Functional/Technical Requirements that the Saba software allegedly contained. These 295 items are listed on pages 37-59 of the SOW.

- Paragraph 1.11 of the SOW listed 18 Enhancements "required by Deere to support business requirements and are assumed in scope."

- Paragraph 7.3 of the SOW provided that requests for changes in the scope of the project can be made during the project. The formal document to effectuate any agreed upon change was entitled a "Scope Change Request (SCR)." Importantly and unequivocally, paragraph 7.3 also provides: "<u>A written SCR must be signed by both parties to authorize implementation of the investigated changes.</u>"

The statements/representations listed above and contained in Section 6.1; Section 5; paragraph 1.11 and Appendix of the SOW were material and false. Saba also knew at the time it made these statements they were false. Saba knew among other things: (a) the implementation could never be done for a fixed price of $791,175; (b) that a Go-Live date of November 1, 2011 was impossible; (c) that the Saba software did not have the 295 Functional/Technical Requirements; and (d) that the 18 listed Enhancements were not in scope. Saba knew these materially false statements were made to induce Deere to execute the February 23, 2011 SOW. Saba further knew Deere would rely upon these material false statements. Deere did rely upon these materially false statements and was damaged by its reliance.

13. The statements, representations and warranties that Saba included in the RFP Response, Subscription Agreement and SOW (which are set forth in pertinent part in paragraphs 9, 11 and 12 above) were willfully and intentionally false and misleading, and Deere relied upon those false and misleading statements, representations and warranties to its detriment. Saba impermissibly defrauded and induced Deere into entering into the Subscription Agreement and SOW by making willfully false and misleading statements, representations and warranties.

These actions were all done with malice and with knowledge of their falsity. Saba knew that it could not deliver the LMS that it falsely committed to Deere that it could deliver for the fixed fee set forth in the SOW.

14.     The impermissible defrauding and inducement included, willfully and with malice, and with knowledge of its falsity, failing to disclose to Deere the material fact that Saba had serious implementation problems with other companies that contracted for the Saba hosted solution that Deere had contracted for pursuant to the SOW and Subscription Agreement. Had Saba disclosed these material facts to Deere, Deere would not have entered into the Subscription Agreement and SOW, for a remote hosted solution. One of the reasons Deere knows that Saba had experienced serious implementation problems with other companies that had contracted for the Saba hosted solutions that Deere had contracted for is because Deere, after the November 11, 2011 Go-Live date was not met and in close proximity to the February 20, 2012 Go-Live date not being met by Saba, spoke with other companies. More particularly, on March 6, 2012, nine Deere representatives spoke with a large U.S. company about its experience with a Saba hosted implementation. Also, on February 9, 2012, eleven Deere representatives spoke with a very large U.S. company about its experiences with a Saba hosted implementation. Moreover, on February 2, 2011, five Deere representatives spoke with a representative of another large U.S. company about its experiences with a Saba hosted implementation.

15.     Saba's impermissible conduct continued even after the RFP was received, the SOW was signed and the Subscription Agreement was signed. In this regard, Saba impermissibly advised Deere that no other company had experienced the same types of serious implementation problems and defects that Deere was experiencing. These types of misleading statements were made on numerous and repeated occasions during the period of March 2011 to

February 2012 as defect after defect and problem after problem occurred, and as Saba failed to meet the November 1, 2011 and February 20, 2012 Go-Live deadlines, as will be discussed below in greater detail.

16. In late March 2012, four Deere representatives traveled to Saba's headquarters in California to discuss Saba's failure to meet the November 1, 2011 Go-Live date and the second February 20, 2012 Go-Live date, as well as the numerous defects and problems that had been encountered, all of which will be discussed in greater detail below. Prior to that meeting, Saba had represented to Deere representatives that no other customer ever traveled to Saba's headquarters to discuss these types of wholesale defects and problems. This representation was not true and simply exemplifies that Saba's conduct throughout was not in good faith.

COMMENCEMENT OF IMPLEMENTATION WORK

17. Following the execution of the SOW and Subscription Agreement, Saba commenced the implementation work in order to achieve the agreed-upon November 1, 2011 Go-Live date. The project was fraught with serious problems and issues from the very start.

18. The problems became so predominant that Deere (through its Quality Center) established a system whereby defects were formally cataloged and given a number ("Defect") (i.e., Defect ID: 4). In fact, 364 "Defect Documents" were generated. Saba was given a copy of each Defect Document as it was generated, and ultimately Saba was given access to Deere's computer system so that it was able to input real time comments into the Defect Documents.

19. Each Defect Document has a "Defect Details" section which, among other things, lists who each Defect was "Detected By" and the "Detected on Date." Remarkably, prior to the November 1, 2011 Go-Live date, <u>169 Defects</u> were detected. The implementation was <u>not</u> completed prior to the November 1, 2011 Go-Live date.

20.     Between the date the SOW was signed (on February 23, 2011) and the agreed upon Go-Live date (November 1, 2011) only two SCR's were executed by the parties and one of the two executed SCR's simply added three Saba resources for $13,440 for "additional data loading of audience types."   The other SCR slightly modified the scope of a few of the Enhancements (deleted some, while adding others) and the net result of these agreed-upon changes resulted in $30,880 being owed by Deere to Saba.   Other than these two executed SCR's, no other changes to the scope of the work set forth in the February 23, 2011 fixed fee SOW changed.

SERIOUS PROJECT MANAGEMENT ISSUES

21.     When it became apparent that the November 1, 2011 Go-Live date would not be met, Deere, in good faith, agreed to extend the Go-Live date to February 20, 2012.  Incredibly, new Defects continued to arise at a fast and furious pace.   In fact, 162 new Defects surfaced between November 1, 2011 and February 20, 2012.

22.     A project of this nature requires a qualified project manager and the continuity of one qualified project manager throughout the project.   Saba was unable to provide a qualified project manager.   Moreover, in total, Saba placed four different project managers on the project, which simply was devastating to the implementation.   The project managers were:

> Saravana Omprakash (3/11 through 6/11)
> Scott Jensen (6/11 through 9/11)
> Mark English (9/11 through 1/12)
> Rachelle Ferris (2/12 through 4/12)

23.     Further, an essential component of an implementation of this nature is the "Business Consultant."  A Business Consultant is the person who knows the applications and would work in setting up and configuring the application so it will meet the requirements of the SOW.   The Business Consultant is in charge of the requirements, understanding and

documenting.  The Business Consultant that Saba originally assigned to the project (Mark Biehl) was terribly incompetent that, at Deere's insistence, Saba had to replace him.

24.    Additionally, Saba originally assigned Luis Anares to the project as a senior technical consultant who was then removed from the project in the April 2011/May 2011 timeframe.

25.    These serious project management issues were material in Saba failing to complete a successful implementation.

### FAILURE TO MEET SECOND GO-LIVE DATE OF
### FEBRUARY 20, 2012 AND EVENTS THEREAFTER

26.    Between November 1, 2011 and February 20, 2012, only five SCR's were executed.  Of the five newly executed SCR's three of them were adding Saba resources to complete the project <u>without</u> changing the scope.  In fact, SCR 7 specifically provides:

> This SCR is to extend Saba consulting resources comprising of Engagement Manager/Business Consultant/Technical Consultants through 2/20/2012.  This SCR has a fixed price.  <u>The scope of the work remains the one mentioned in the Software Subscription Services Agreement ("Agreement") between Saba and Deere dated February 23, 2011 – Deere contract #50945 – in direct support of the Statement of Work SOW "Implementation of Saba Learning Management" dated February 23, 2011 – Saba Contract #11512783 SOW</u>.  (Emphasis added.)

27.    The other two SCR's executed between November 1, 2011 and February 2012 simply (a) added some additional customizations for "two of the current customizations" for $8,240, and (b) necessitated three additional data migration scripts for $11,400.

28.    Notwithstanding Deere agreeing to pay for additional Saba resources between November 1, 2011 and February 20, 2012, the project was not completed, or even close to being completed, by February 20, 2012.  Deere continued to hope that somehow Saba would be able to get its act together.  However, Defects continued to surface at the same fast and furious pace as

they had up until February 20, 2012.  In fact, between February 20 and the time the project was shut down in very early April.

29.     Pursuant to Section 9.1 of the Subscription Agreement, four Deere representatives traveled to Saba's headquarters in California in early April pursuant to the internal dispute resolution requirement.  While Deere's representatives traveled to California in good faith, the meeting was utterly unproductive because the Saba representatives only wanted to talk about Deere paying Saba even though the system was not working or close to working.  Deere was unaware at that time of Saba's internal financial problems, which culminated in its delaying its third quarter fiscal 2012 and its stock price dropping 18%.  Shortly after this failed meeting, Saba ceased working on the project.  More specifically, on April 15, 2012, Saba advised Deere in writing that it suspended delivery of Consulting Services to Deere.

SECOND INTERNAL DISPUTE RESOLUTION MEETING
PURSUANT TO PARAGRAPH 9.1 OF THE SUBSCRIPTION AGREEMENT

30.     In August of 2012, different representatives of Deere and Saba (along with both in-house and outside counsel) met pursuant to the paragraph 9.1 internal dispute resolution requirement to see if the matter could be amicably resolved.  This meeting was in Moline, Illinois.  The meeting was not successful and the parties thereafter took the appropriate steps to commence a mediation proceeding.  The mediation proceeding was conducted in Chicago, Illinois on November 5 and 6, 2012 and was not successful.

31.     In addition to there being 364 Defect Documents generated, in order to afford a greater perspective of the scope and magnitude of the services problems/gaps/issues/Defects encountered throughout the failed implementation, the following problems with the implementation are provided:

### FAILURE TO DELIVER PRODUCTION READY VERSIONS

32.    The Agreements obligated Saba, among other things, to deliver production ready versions of the following:

  A.    (OOB) Saba Centra -- never done.

  B.    (Customized) LMS Solution with the agreed upon customizations -- not done even with Deere making several concessions.

  C.    (OOB) Learning Development Kit (LDK) -- Deere was never able to use, and Saba did not provide the requisite training.

  D.    (Customized) Hindi language pack -- Saba delivered a version, but never worked with Deere to define or verify the language pack functionality.

### PROBLEMS RELATING TO FAILURE TO PROVIDE AN APPROPRIATE PROJECT PLAN AND PROPER PROJECT MANAGEMENT

33.    The Agreements obligated Saba, among other things, to:

  A.    Provide Project Management with detailed project plans, business requirements, and technical specifications.  Saba did not fulfill these essential obligations.

    1.    Saba provided project plans that (i) did not include the necessary specificity and granularity, and (ii) did not detail with the requisite specificity what Deere's roles and responsibilities were.  The project plans also did not cover Saba tasks at a useful level to allow collaboration between Saba and Deere.

    2.    Saba's ongoing project management was lacking in structure, detail, and proactive solutioning.

B.    Dedicate Kevin and Minoo to this project.  Deere came to understand that Kevin and Minoo were not 100% dedicated to the Deere project.

34.    On numerous occasions, the key stakeholders at Deere requested a detailed and accurate project plan from Saba.  Saba was never able to produce a specific and accurate project plan.  Deere was forced, at great expense, to hire a full-time project manager to monitor the project plan.

35.    A specific example of a situation that could have been avoided with an accurate project plan is the alleged missed timeline by Deere for the data extracts.  In Saba's original project plan, it is impossible to ascertain when Deere was to provide data to Saba.  On May 31, 2011, Deere received an email from Saba asking for a full data load by June 20, 2011.  Because of a lack of an accurate project plan, Deere was not able to proactively assign resources to create the complex software code and deliver millions of rows of data to meet this specific timeline.  And, note that incorrect assumptions and documentation by Saba's configuration manager led to multiple changes to the specifications for these data extracts well into 2012.

36.    Saba's original configuration manager failed to accurately collect and document the requirements of Deere.  On multiple occasions, Deere expressed its concern with this individual and he was finally removed from the project in early October, 2011.  The inability of this individual to determine the exact requirements and to accurately document requirements, and this individual's misrepresentation of Saba's understanding of the requirements, were extremely detrimental to the project.  They led to delays/rewrites in the final technical specification for enhancements, continual re-writes of the technical specifications for the data loads, hindered the ability of team members to meet timelines, and ultimately destroyed the project.

37.     In view of the problems with the project plan and terrible project management, Saba was never able to produce an environment suitable for user acceptance testing.  On two different occasions, Deere had dozens of testers assigned to perform user acceptance testing.  On both occasions, Deere was forced to cancel the tests.  These tests were vital to making sure the functionality that Saba was obligated to deliver could in fact be delivered.

OTHER SERIOUS PROBLEMS/DEFAULTS

38.     Other additional service problems and defaults are:

A.     Saba never delivered the original set of LMS scoped functionality.  Saba could never provide the set of the required original business requirements captured during the workshop from February/March of 2011.  Because Saba remained unable to provide the business requirements, it was ultimately determined that:

1.     21 gaps were identified as missing from the expected original codeset; one of which Deere conceded to remove;

2.     1 identified modification was a mixture of a gap and change.

B.     Saba consistently failed to be proactive in communicating and resolving issues.  On a repeated basis, Deere had to escalate issues to executives.  On a repeated basis, system issues occurred which were not easily explained by Saba.  Saba consistently failed to provide expected delivery dates when it would provide solutions or assistance on reported issues.

C.     Saba would continually request additional fees, while never providing a working solution.  As Saba continued to fail to meet its obligations under the Subscription Agreement, it continually tried to have Deere make

significant concessions on the scope and breadth of functionality it allegedly would receive.  Saba failed to take into consideration the totality of the concessions it asked Deere to make and had Saba ever been able to deliver an operating system then Deere end users would have waited 18 months for a less functional system than had been in use within Deere.  <u>Deere had to continually remind Saba that 21 identified gaps referenced above were requirements</u>.

D.    Saba failed to provide an expert resource capable of implementing notifications.

E.    Saba failed to provide an expert regarding the Language Development Kit.

F.    There were inaccurate and ineffective translations in the Language Packs.

SERIOUS PROBLEMS/DEFAULTS
ENCOUNTERED DURING VARIOUS STAGES OF "SOW"

39.    The various stages of the implementation were fraught with problems and defaults, which are represented by the following:

<u>Phase I – Project Initiation</u>

A.    Initial high-level project plan (lacking the requisite specificity and granularity) was provided during this Phase.  Further details including inter-related tasks were not added by Primary Project Manager (Saba), and Saba did not fully define Deere's resources or tasks.

B.    Due to continued project mismanagement, slippages and vague leadership by Saba, Deere had to hire outside contractor to attempt to:

1.    Provide project management and execution of a project plan, along with Deere internal project tasks; and

- 17 -

2.    Create and manage an accurate and detailed project plan.

Phase II / III – Solution Specification/Design

A.    Original Business Requirements ("BR") from Saba's onsite workshop were never provided to Deere. Rather, they had only the Technical Specifications ("TS") in "Saba technical jargon." Deere continually pushed to understand how Saba arrived at the TS without having the written BR. As such, no formal review of the BRs occurred early in the project. Saba was adamant about not documenting the BRs, but proposed no other valid alternative. As such, Deere finally had to attempt to create them. This was done late in 2011 and early 2012.

B.    Throughout the original timeline (February–November 2011), Deere, because of Saba's problems/defaults, had no alternative except to concede on numerous functionality in the hope that the November 2011 implementation date would be achieved. Even so, Saba was unable to deliver the reduced scope. It became apparent to Deere that the November 2011 delivery would not be met. Saba requested additional concessions such as reduced UAT testing (which Deere was never able to execute due to not having full codeset or data) and system functionality.

Phase IV – Solution Development

A.    Saba was unable to complete core developments and successful tests.

1.    Integration and migration scripts were never completed.

(a) Saba team was unable to implement LMS solution; and

(b) Out of the box (OOB) errors with Notifications were unable to be fully explained or resolved.

## Phase V – Solution Testing

A.  Saba's poor management of environments.

1.  Repeated inability to consistently create environments.

(a)  DEV server --  often times the codeset, configuration, and other Saba settings were not transferred wholly into other environments, caused additional testing/coding/error detection in subsequent environments;

(b)  Unstable QA server -- performance issues, down with no prior notice from Saba; Saba never provided full set of code in QA; Deere never able to conduct UAT; and

(c)  Production box was never load tested.

2.  QE environment not reflective of Deere environment -- caused code to be consistently deployed to subsequent environments with errors.

3.  Key Saba staffing who was intended to be 100% dedicated to Deere, was not dedicated 100% to Deere.

4.  Deere continually requested a walkthrough of Saba's Production Load Testing documents and results.  Despite the repeated requests, Deere never received a completed copy.

B.  OOB Saba Centra solution had repeated issues.

1.  With no testing or acceptance by Deere, Saba Centra installed onto Saba production server.

2.   Deere was then requested to approve production, although the OOB functionality was not operational.

C.   Saba was never able to demonstrate end-to-end execution of migration scripts.  (August 2011 – February 2012) Saba LMS Deliverables continually had errors of varying criticality.  As part of preliminary UAT tests, many code issues were identified.  It was at this time the Go-Live had to be pushed to February 2012.  Unfortunately, the same repeated issues of undelivered codesets, unstable UAT environments, and inability to create a functioning out-of-box Saba Centra environment, the February 2012 Go-Live was unreachable.  During all this time, no production was available to Deere.  Saba was on notice of all these serious problems/defaults and many executive conversations occurred.

DAMAGES

40.   The damages that Deere has sustained from this failed project are very significant and continue to grow daily.  Deere's damages fall into three categories.  The first category is out-of-pocket losses paid in connection with the Subscription Agreement, LMC, SOW, and Centra Agreement and SOW.  The second category of damages relates to the additional monies that Deere has had to pay to Accenture since November 2011 (the date the Saba system should have gone live).  Had the Saba system gone live in November, Deere would have been able to cease paying Accenture the monthly fees that are owed with respect to the External LMS System.  The Accenture monthly fees are comprised of a Transaction Fee, Support Fee and AT&T Connect Fee.  The third category will be the increased costs Deere will incur to install a different LMS system since the different system Deere has selected is more expensive than the Saba LMS.

41.    Since the Subscription Agreement and SOW were signed in February 2011, Deere has paid $2,154,442 to Saba.    The breakdown of the payments is below.    Deere seeks recoupment of the entire amount paid for this failed implementation.

| | | |
|---|---|---|
| LMS | Product Schedule | $1,031,000 |
| LMS | SOW | 411,525 |
| LMS | SOW – Consulting | 108,000 |
| Centra | SOW | 24,920 |
| Centra | Product Schedule | 209,559 |
| SCR | Consulting | 13,395 |
| SCR 05 | Consulting | 33,480 |
| SCR 06 | Course Code | |
| SCR 07 | Consulting | 275,000 |
| SCR 08 | Data Migration | 2,280 |
| Travel | | 45,283 |
| TOTAL: | | $2,154,442 |

42.    The Accenture monthly fees that have been incurred and paid by Deere since November 2011 through September 30, 2012 are $3,895,000 (this is an average of $355,000 per month).    Deere will continue to incur these monthly damages until it is able to go live with a new LMS product.

43.    The different LMS that Deere has selected is more costly than the Saba LMS. Therefore, Deere's damages have to include this amount.    At this juncture, the precise amount is not known but it is known that the amount will be significant (a seven figure number).

## ADDITIONAL INDICIA OF SABA'S
## UNSCRUPULOUS BUSINESS PRACTICES

44.    During the course of the negotiations of the contract documents, Saba and its in house attorneys knew that Deere was represented by its in house attorney Kimberly King. Shockingly, Saba's in house attorney Caroline Pappas, after dealing with Kimberly King, on numerous and repeated occasions, communicated directly with a Deere business representative without requesting permission from Deere to make such communications and without ever

informing Deere's attorneys that it was communicating with a Deere business representative directly. These repeated communications were in direct contravention of Rule 4.2 of the Illinois Rules of Professional Conduct which provides:

> In representing a client, a lawyer shall not communicate about the subject of the representations with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is so authorized to do so by law or a court order.

45. The impermissible communications by Caroline Pappas on behalf of Saba were designed to attempt to take advantage of the Deere business representative who did not understand and/or appreciate the significance of what Saba's attorney was attempting to do from a legal standpoint.

## FIRST COUNT
### (Breach of Contract)

46. Deere repeats, realleges and incorporates herein each and every allegation contained in paragraphs 1 through 45 as if fully set forth herein.

47. Saba materially breached the Subscription Agreement as set forth above which included but was not limited to breaches of paragraphs 7.2.3, 7.2.4 and 7.2.5. Saba was never able to deliver the LMS and as such the "deliverable" that Saba was supposed to provide (the agreed upon working LMS) was never provided, and as such Deere is entitled, among other things, to all fees paid to Saba for failure to provide the deliverable of a working LMS.

48. Saba materially breached the SOW as set forth above which included but was not limited to breaches of Section 5, Section 6, Paragraph 1.11, Appendix 2, as well as the seven Scope Charge Requests ("SCR's") that were executed by both parties.

49. Saba was placed on notice of the breaches of the agreement and failed to cure same. In fact, it was Saba that suspended work on the implementation on April 15, 2012.

50.     As a direct and proximate result of Saba's numerous and material breaches of the Subscription Agreement, SOW and SCR's, Deere has been damaged in an amount to be determined at trial, but believed to be in excess of $7,000,000 and constantly increasing.

51.     In light of the willfully false and misleading statements; the willfully false and misleading representations; the willfully false and misleading warranties; the willfully false and material omissions; the malice, including statements made with knowledge of their falsity; the defrauding and impermissible inducement of Deere (which impermissible inducement was prior to entering into the Subscription Agreement and SOW and after the initial November 1, 2011 Go-Live date was not met), along with the willful and intentional acts discussed above, Deere is entitled to all the damages that it has sustained from Saba.

WHEREFORE, Deere demands judgment against Saba for all damages it sustained, compensatory damages, costs, attorneys' fees and such further relief as the Court deems appropriate.

## SECOND COUNT
(Unjust Enrichment)

52.     Deere repeats, realleges and incorporates herein each and every allegation contained in paragraphs 1 through 51 as if fully set forth herein.

53.     Saba has been unjustly enriched by the amounts Deere has paid to it pursuant to the Subscription Agreement, SOW and SCR's, as well as a SOW and Agreement for Centra web-conferencing signed on August 31 2011.

54.     Saba should be directed to repay all such amounts received by Deere as set forth in paragraph 36 above.

WHEREFORE, Deere demands judgment against Saba for all damages it sustained, compensatory damages, costs, attorneys' fees and such further relief as the Court deems appropriate.

### THIRD COUNT
(Fraud)

55.  Deere repeats, realleges and incorporates herein each and every allegation contained in paragraphs 1 through 54 as if fully set forth herein.

56.  The allegations, among others, specifically set forth in paragraphs 9, 10, 11, 12, 13, 14, 15 and 16 demonstrate that Saba made numerous material false statements and it knew at the time all these statements were made that same were false.  Saba also made these material false statements to induce Deere to enter into contractual agreements.  Deere relied upon the materially false statements and did enter into the February 23, 2011 SOW and Subscription Agreement.  Deere's reliance resulted in Deere being damaged as set forth above.

57.  The fraudulent actions and false statement of Saba as set forth above were not only willful and with malice, the false statements were also wantonly and designedly made and indicate an absolute wanton disregard of the rights of Deere.  The false statements when read as a whole were also part and parcel of a course of conduct which showed actual and deliberate intention to harm Deere.  The false statements when read as a whole demonstrate a reckless indifference to the rights of Deere.

WHEREFORE, Deere demands judgment against Saba for all damages it sustained, compensatory damages, punitive damages, costs, attorneys' fees and such further relief as the Court deems appropriate.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all of the triable issues of the First Amended Complaint.

By:     */s/Jason J. O'Rourke*
Jason J. O'Rourke
LANE & WATERMAN LLP
220 North Main Street, Suite 600
Davenport, IA  52801-1987
Telephone: (563) 324-3246
Facsimile:  (563) 324-1616
Email:  jorourke@l-wlaw.com

Peter J. Frazza, Esq.
BUDD LARNER, PC
150 John F. Kennedy Parkway
Short Hills, NJ  07078-0999
Telephone:  (973) 379-4800
Email: pfrazza@buddlarner.com

ATTORNEYS FOR PLAINTIFF
DEERE & COMPANY

**CERTIFICATE OF SERVICE**

I hereby certify that on December 21, 2012, I electronically filed the foregoing with the Clerk of Court using the ECF system.

    */s/Jason J. O'Rourke*
Jason J. O'Rourke